# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## Case No. 16-2685

---

### THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,

Appellee,

v

### AMERICAN FUTURE SYSTEMS, INC., d/b/a PROGRESSIVE BUSINESS PUBLICATIONS, a corporation, and EDWARD SATELL, individually and as President of the above-referenced corporation,

Appellants

On Appeal from an Order Granting a Motion for
Summary Judgment in the United States District
Court for the Eastern District of Pennsylvania

No. 2:12-cv-06171

---

### BRIEF OF *AMICUS CURIAE*
### A BETTER BALANCE AND NATIONAL
### EMPLOYMENT LAW PROJECT, INC.

**Sherry Leiwant**
**Margaret (Molly) Weston Williamson**
**A Better Balance**
**80 Maiden Lane, Suite 606**
**New York, NY 10038**
**(212) 430-5982**

**Catherine Ruckelshaus**
**General Counsel**
**National Employment Law Project**
**75 Maiden Lane, Suite 601**
**New York, NY 10038**
**(646) 693-8221**

*Attorneys for Amicus*

# Table of Contents

Table of Authorities ...................................................................................ii

Statement of Interest of Amici ................................................................ 1

Summary of Argument................................................................................ 2

Argument........................................................................................................4

     I.     Progressive engaged in wage theft in violation of the Fair
            Labor Standards Act, which was enacted to protect workers'
            economic security...............................................................................4

          A. Wage theft is prevalent in low-wage sectors and creates
             economic stress for workers and their families............................4

     II.    There is no contradiction between paying workers fairly and
            providing flexibility...........................................................................8

          A. Low-wage workers need adequate wages to ensure their
             economic security and enable them to balance the demands
             of work and family. ........................................................................8

          B. Progressive's view of "flexibility" is not available for most
             workers.......................................................................................10

          C. Real-life workplace flexibility arrangements can have
             benefits for both employees and employers................................11

Conclusion....................................................................................................13

# Table of Authorities

## Cases

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945)....................................................4

*Brock v. Richardson*, 812 F.3d 121 (3d Cir. 1987) ....................................................4

*Rutherford Food Corp. v. McComb,* 331 U.S. 722 (1947) .......................................4

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590 (1944) ..............................................................................................................................4

## Statutes and Rules

29 U.S.C. § 201 *et seq* ..............................................................................................1, 4

29 C.F.R. § 785.18 ......................................................................................................4

Federal Rules of Appellate Procedure 27 and 29 .....................................................1

## Other References

Annette Bernhardt et al., Ctr. for Urban Econ. Dev. et al., *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities* (2009) ...........................................................................................5

Kimberly Bobo, *Wage Theft in America: Why Millions of Working Americans Are Not Getting Paid—And What We Can Do About It* (2009) ..............6

James T. Bond and Ellen Galinsky, Families & Work Inst., *National Study of the Changing Workforce: Workplace Flexibility and Low-Wage Employees,* (2011)................................................................................................13

Kathleen Christensen et al., *Families with school-age children*, 21 Future Child 69 (2011). ..........................................................................................9, 11

Empl't Standards Admin., Wage and Hour Div., U.S. Dep't of Labor*, 1999– 2000 Report on Initiatives* (2001) ...........................................................................6

David Filwood, *Call Center "Wage Theft" Lawsuits On The Rise*, LinkedIn (July 28, 2015). ...................................................................................... 7

Daniel Galvin, *Deterring "Wage Theft": Alt-Labor, State Politics, and the Policy Determinants of Minimum Wage Compliance* (Nw. U. Inst. for Pol'y Res., Working Paper No. WP-15-08, 2016) .............................................. 6

Colin Gordon et al., The Iowa Pol'y Project, *Wage Theft in Iowa* (2012) ............... 6

Cynthia S. Hernandez & Carol Stepick, *Wage Theft: An Economic Drain on Florida* (2012). .................................................................................. 7

E. Jeffrey Hill, *Finding an Extra Day a Week: The Positive Influence of Perceived Job Flexibility on Work and Family Life Balance,* 50 Family Relations 49 (2001). ........................................................................... 13

Tom Juravich et al., *The Epidemic of Wage Theft in Residential Construction in Massachusetts* (2015) .................................................................... 7

Kathleen Koster, *Nixing 9 to 5: Flexible work strategies for employers with a nonexempt workforce,* Employee Benefits News (October 1, 2011). ................. 14

Tami Lubhy, *Working, but still poor*, CNN.com (May 11, 2015). ........................ 10

Ruth Milkman et al., *Wage and hour violations in urban labor markets: a comparison of Los Angeles, New York and Chicago,* 43 Indus. Rel. J. 378 (2012). .............................................................................................. 6

Susan Miloser, *Picking Pockets for Profit: Wage Theft and the Fair Labor Standards Act* (2011) ...................................................................... 6

Sarah Maslin Nir, *The Price of Nice Nails*, N.Y. Times (May 7, 2015). ................ 7

Nat'l Empl't Law Project, *Winning Wage Justice: An Advocate's Guide to State and City Policies to Fight Wage Theft* (2011). ................................... 7

Nat'l Empl't Law Project, *Winning Wage Justice: A Summary of Research on Wage and Hour Violations in the United States* (2013) ...................... 6

iii

Oregon Ctr. for Pub. Pol'y, *Restaurants, Bars and Business Services Lead in Minimum Wage Complaints* (2015). ........................................................................6

Diane E. Schmidt & Gilbert Duenas, *Incentives to Encourage Worker Friendly Organizations*, 31 Pub. Personnel Mgmt. 293 (2002)..........................9, 12

Sheller Ctr. for Social Justice, Temple University, *Shortchanged: How Wage Theft Harms Pennsylvania Workers and Economy* (2015). .....................................6

Wage and Hour Div., U.S. Dep't. of Labor, *Nursing Home 2000 Compliance Survey Fact Sheet* (2000). ........................................................................................7

Wage and Hour Div., U.S. Dep't. of Labor, Only One-Third Of Southern California Garment Shops In Compliance With Federal Labor Laws (Aug. 12, 2000). ..............................................................................................................7

Wage and Hour Div., U.S. Dep't of Labor, Workers Face Millions in Unpaid Wages in Southern California Garment Industry (Nov. 6, 2014). ...........................6

Nick Wing, *Here's the Painful Truth About What It Means To Be 'Working Poor' In America*, Huffington Post (May 19, 2014). .............................................10

## STATEMENT OF INTEREST OF AMICI

Amici are dedicated to ensuring that the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") is interpreted consistent with its broad remedial nature so that workers are paid fairly and in full conformity with the law. Amici submit this brief not to repeat the arguments made by the parties, but rather to shed light on the problems of wage theft in today's economy and on the real nature of flexible work arrangements that the employer in this case, Progressive Business Publications ("Progressive"), alleges that it provides to its employees. Amici respectfully submit this brief pursuant to Federal Rules of Appellate Procedure 27 and 29 and Third Circuit Local Rule 29.[1]

A Better Balance is a national legal advocacy organization dedicated to promoting fairness in the workplace and helping employees meet the conflicting demands of work and family. Through legislative advocacy, litigation, research, and public education, A Better Balance is committed to helping workers care for themselves and their families without risking their economic security. The organization runs a legal clinic serving low-wage workers on work-family issues including pregnancy discrimination and accommodation, caregiver discrimination, paid sick time, and family and medical leave. The issues raised in this case

---

[1] Neither party's counsel authored this brief, in whole or in part, and nor did either party or party's counsel contribute money intended to fund the preparation or submission of the brief. No person, including *amici curiae*, their members, or their counsel contributed money that was intended to fund the preparation or submission of the brief. Both parties have consented to the filing of this brief.

1

regarding the needs of low-wage workers for both fair pay and supportive, flexible policies go to the heart of A Better Balance's mission.

The National Employment Law Project ("NELP") is a non-profit legal organization with over 45 years of experience advocating for the employment and labor rights of low-wage and unemployed workers.  NELP seeks to ensure that all employees, especially the most vulnerable ones, receive the full protection of labor standards laws, and that employers are not rewarded for skirting those basic rights by engaging in wage theft.  NELP's areas of expertise include wage and hour rights, and it has litigated directly and participated as amicus in numerous Circuit and U.S. Supreme Court cases addressing workers' under the Fair Labor Standards Act and state wage and hour laws. This case is important to NELP and its constituents because the proper application of long-standing U.S. Department of Labor rules related to the compensability of short work breaks has enormous potential to alleviate the stresses that accompany low-paying jobs like the ones in this case. This Court's decision could affect thousands of low-paid workers, as well as law-abiding employers who play by the rules and pay their employees properly.

## SUMMARY OF ARGUMENT

This is a case brought by sub-minimum wage workers at a telemarketing call center who were not paid for breaks of less than twenty minutes, in violation of federal law. Progressive and its amici attempt to frame this as a case about

2

providing employee "flexibility," and the ability of employees to balance their work and their family or other outside needs. In reality, this case is about wage theft, a persistent problem in our economy that disproportionately affects low-wage workers. Employees at Progressive since 2009 have not been paid for breaks as short as a few minutes and, as a result, earn less than the federal minimum wage of $7.25 an hour. This constitutes illegal wage theft. Low-wage workers need and deserve to be paid properly for their work, including for short breaks compensable under long-standing federal rules. They do not forfeit that right solely because their employer provides a purportedly flexible break policy.

Progressive implies that if it were required to pay for breaks of less than twenty minutes, it would somehow be forced to end its current break policy. This is false. Nothing in the Fair Labor Standards Act prevents employers from allowing any breaks or breaks of any length. Instead, the law simply requires that employees be fairly compensated for certain of those breaks, including those at issue here. While it is certainly possible that Progressive might change its break policy, doing so would be a voluntary choice by Progressive, not an inevitable consequence of being required to follow the law. If Progressive truly cares about its employees, their productivity, and their tenure at the company, it will continue to offer breaks while also properly compensating employees. In order to truly balance the needs of work and family, workers need both fair wages as guaranteed by law and truly flexible workplace policies, which go beyond Progressive's narrow approach.

3

For these reasons, this Court should uphold the district court's decision.

## ARGUMENT

**I. Progressive engaged in wage theft in violation of the Fair Labor Standards Act, which was enacted to protect workers' economic security.**

This case presents questions of the application of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, which requires the payment of a minimum wage of $7.25 an hour for hours worked. The district court rightly found that long-standing rules properly require employers to pay for short breaks taken by employees, 29 C.F.R. § 785.18. The FLSA was passed to "lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions," *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727 (1947), by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of the President to Congress, May 24, 1937). It is a humanitarian and remedial statute intended to be applied broadly. *Brock v. Richardson*, 812 F.3d 121, 123 (3d Cir. 1987) (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597 (1944)).

**A. Wage theft is prevalent in low-wage sectors and creates economic stress for workers and their families.**

4

Wage theft, or the failure to pay workers the wages owed to them, is a
nationwide problem. Employers fail to pay the minimum wage; force employees to
work off the clock; fail to pay overtime; misclassify employees as contractors or
managers to exempt them from worker protections; steal tips; deduct money from
employees' pay; and even fail to pay at all in many industries. A seminal 2009
study of 4,387 low-wage workers found that: (1) more than two-thirds experienced
at least one pay-related violation in their previous work week, including a quarter
of workers who were paid less than minimum wage; (2) three quarters of those
surveyed were not paid proper overtime wages; (3) 57% did not receive pay stubs
in violation of state laws requiring employer to provide workers with written
documentation of wages, rates of pay, and hours worked; and that (4) workers in
low-wage industries in the three cities of New York, Chicago, and Los Angeles
lose over $56 million per week in unpaid wages.[2]

This study's findings have been confirmed by dozens of other surveys and
studies showing what can only be described as staggering rates of violations of
wage and hour laws. Surveys by the U.S. Department of Labor found 50% of
restaurants in Pittsburgh, 74% of day care centers in Georgia, 50% of nursing
homes in St. Louis, 38% of hotels and motels in Reno, and 42% of adult family

---

[2] Annette Bernhardt et al., Ctr. for Urban Econ. Dev. et al., *Broken Laws, Unprotected Workers:
Violations of Employment and Labor Laws in America's Cities* (2009), available at
www.nelp.org/page/-brokenlaws/BrokenLawsReport2009pdf.

homes in Seattle violated wage and hour laws.[3] A recent USDOL survey of

garment firms in Los Angeles found violations in 89% of more than 1,600 cases in

Southern California alone since 2009, leading to more than $15 million in

recovered back wages for nearly 12,000 workers.[4] A survey of recent Current

Population Survey data found that between 2005–2013, 16% of respondents were

not paid properly in the last year, getting shorted about 26% of what they were

owed.[5] State wage theft studies in Iowa,[6] Oregon,[7] and Pennsylvania[8] are among

myriad studies showing high rates in labor-intensive industries.[9] Sectors that are

---

[3] Empl't Standards Admin., Wage and Hour Div., U.S. Dep't of Labor, *1999–2000 Report on Initiatives* 7–9 (2001), available at http://nelp.3cdn.net/a5c00e8d7415a905dd_o4m6ikkkt.pdf.
[4] Press Release, Wage and Hour Div., U.S. Dep't of Labor, Workers Face Millions in Unpaid Wages in Southern California Garment Industry (Nov. 6, 2014), available at http://www.dol.gov/whd/media/press/whdpressVB3.asp?pressdoc=Western/20141106.xml.
[5] *See* Daniel Galvin, *Deterring "Wage Theft": Alt-Labor, State Politics, and the Policy Determinants of Minimum Wage Compliance* (Nw. U. Inst. for Pol'y Res., Working Paper No. WP-15-08, 2016), available at http://www.ipr.northwestern.edu/publications/papers/2015/ipr-wp-15-08.html.
[6] Colin Gordon et al., The Iowa Pol'y Project, *Wage Theft in Iowa* (2012), available at http://www.iowapolicyproject.org/2012docs/120827-wagetheft.pdf.
[7] Oregon Ctr. for Pub. Pol'y, *Restaurants, Bars and Business Services Lead in Minimum Wage Complaints* (2015), available at http://www.ocpp.org/media/uploads/pdf/2015/04/fs20150415MinWageViolationsfnl.pdf.
[8] Sheller Ctr. for Social Justice, Temple U., *Shortchanged: How Wage Theft Harms Pennsylvania Workers and Economy* (2015), available at https://www2.law.temple.edu/csj/files/wagetheft-report.pdf.
[9] For a summary of these and other surveys and research from across the country, see Nat'l Empl't Law Project, *Winning Wage Justice: A Summary of Research on Wage and Hour Violations in the United States* (2013), available at http://www.nelp.org/content/uploads/2015/03/WinningWageJusticeSummaryofResearchonWage Theft.pdf; *see also* Susan Miloser, *Picking Pockets for Profit: Wage Theft and the Fair Labor Standards Act* (2011), http://www2.wlu.edu/documents/shepherd/academics/cap_11_miloser.pdf. *See generally* Kimberly Bobo, *Wage Theft in America: Why Millions of Working Americans Are Not Getting Paid—And What We Can Do About It* xi, 41 (2009); Ruth Milkman et al., *Wage and hour violations in urban labor markets: a comparison of Los Angeles, New York and Chicago*, 43 Indus. Rel. J. 378–398 (2012).

particularly prone to wage theft include, construction[10]; nursing homes,[11]

agriculture, garment[12], nail salons,[13] restaurants, and janitorial.[14]

Most relevantly, telemarketing and call center employers show high rates of

wage theft as well.[15] Progressive, like many others in its sector, routinely deprives

its workers of wages they have earned.

---

[10] New research published by the University of Massachusetts Amherst Labor Center shows that the illegal theft of workers' wages has reached epidemic levels in the residential construction industry in Massachusetts. *See* Tom Juravich et al., *The Epidemic of Wage Theft in Residential Construction in Massachusetts* (2015), available at https://www.umass.edu/lrrc/sites/default/files/Wage_Theft_Report.pdf.

[11] In 2000, the U.S. Department of Labor's Wage and Hour Division ("WHD") found that 60% of nursing homes and other personal care facilities were not in compliance with minimum wage, overtime, and child labor laws. *See* Wage and Hour Div., U.S. Dep't. of Labor , *Nursing Home 2000 Compliance Survey Fact Sheet* (2000), available at https://www.dol.gov/whd/healthcare/surveys/nursing2000.htm.

[12] A WHD study of the garment industry in Los Angeles found that two-thirds of garment employers violated minimum wage or overtime laws, or both in 2000. *See* Press Release, Wage and Hour Div., U.S. Dep't. of Labor, Only One-Third Of Southern California Garment Shops In Compliance With Federal Labor Laws (Aug. 12, 2000), available at https://www.dol.gov/whd/media/press/sfwh112.htm.

[13] New employees were often required to pay a $100 deposit in order to work, trained for weeks without pay, and then paid as little as $30 per day for 12-hour days, six or seven days a week. Most workers did not complain for fear of deportation, job loss, or abuse. *See* Sarah Maslin Nir, *The Price of Nice Nails*, N.Y. Times (May 7, 2015), available at http://www.nytimes.com/2015/05/10/nyregion/at-nail-salons-in-nyc-manicurists-are-underpaid-and-unprotected.html?_r=0.

[14] DOL reports these industries as persistently in violation of wage and hour laws: 60% of nursing homes; 89% of non-monitored garment factories in Los Angeles and 67% of non-monitored garment factories in New York; in agriculture, 25% of tomato producers, 35% of lettuce, 51% of cucumber, 58% of onion, and 62% of garlic producers stole workers' wages. In 1999, 78% of restaurants in New Orleans stole wages. *See* Nat'l Empl't Law Project, *Winning Wage Justice: An Advocate's Guide to State and City Policies to Fight Wage Theft* 5–6 (Jan. 2011), available at http://www.nelp.org/content/uploads/2015/03/WinningWageJustice2011.pdf.

[15] David Filwood, *Call Center "Wage Theft" Lawsuits On The Rise*, LinkedIn (July 28, 2015), https://www.linkedin.com/pulse/call-center-wage-theft-lawsuits-rise-david-filwood; *see also* Gordon, *supra* note 6, at 6; Cynthia S. Hernandez & Carol Stepick, *Wage Theft: An Economic Drain on Florida* 3 (2012), available at https://www.afsc.org/sites/afsc.civicactions.net/files/documents/Wage%20Theft%20How%20Millions%20of%20Dollars%20are%20Stolen%20from%20Florida.pdf.

**II.  There is no contradiction between paying workers fairly and providing flexibility.**

Progressive's claim and the claim of its amicus hinge on the notion that there is an inherent tradeoff between providing flexibility and adequately compensating workers. This dire assertion is provided without evidence or specification, only the implication that complying with the law on compensating short breaks would somehow force Progressive to change its policy around offering breaks. This implication is false. Progressive could easily continue its current break policy while also paying workers for short breaks as required by law; if it were to terminate its current policy, doing so would be a choice Progressive made, not a natural consequence of compliance with FLSA.

More broadly, Progressive and its allies have suggested that flexible workplace arrangements are somehow a substitute for fair pay. In reality, workers, especially low-wage workers, need both adequate wage and truly flexible policies to balance the needs of work and family. Contrary to some of the assertions made in this case, fair pay and flexibility are not only not in conflict but are also in fact mutually reinforcing.

**A. Low-wage workers need adequate wages to ensure their economic security and enable them to balance the demands of work and family.**

8

For many low-wage workers, access to a reliable income is a critical determinant of their ability to satisfy the demands of both work and family. However, under Progressive's policy, instituted in 2009 when the federal minimum wage rose to $7.25 an hour, employees were not compensated for any breaks. Joint Statement of Stipulated Facts, at 28, 30. As a result, employees were often paid less than the minimum wage. These inadequate and illegally low wages cause great suffering for workers like those at Progressive. One study cited by amici for Progressive concludes that "[w]orking family income has never really recovered from the recessionary problems of the 1980s and 1990s… hourly wage earners have suffered a decline in wages, slower compensation growth, shrinking health benefits, and a rise in job insecurity."[16]

The ability to take time off is also directly and cyclically connected with workers' economic security. For those living paycheck-to-paycheck, unpaid time off, no matter how generous, comes at a concrete cost they may not be able to afford. Many low-income workers hold jobs that have fluctuating hours and few benefits, such as paid sick or vacation days. This means that even a single day away from work to care for a sick child requires the loss of a much-needed day's pay and can even risk the loss of a worker's job.[17] Moreover, low-wage workers

---

[16] Diane E. Schmidt & Gilbert Duenas, *Incentives to Encourage Worker Friendly Organizations*, 31 Pub. Personnel Mgmt. 293, 294 (2002).
[17] *See* Kathleen Christensen et al., *Families with school-age children*, 21 Future Child 69, 82 (2011), http://futureofchildren.org/publications/docs/21_02_04.pdf.

like the ones at Progressive are often unable to afford unpaid time to be engaged in their children's education and to assist in their success.[18]

Progressive's illegal policy compromises workers' economic security by undermining their ability to earn wages sufficient to support themselves and their families. In turn, this decreases workers' ability to balance the needs of work and family. Workers need both decent pay and flexibility. Our labor laws support decent pay by requiring fair compensation including payment for certain breaks. There are no laws guaranteeing better flexibility policies although amici are working to advance those policies. What is certain, however, is that workers' lives are not helped by policies purporting to support flexibility that violate the workers' rights to fair wages under the law.

### B. Progressive's "flexibility" is not available for most workers.

Progressive and its amicus argue that Progressive offers a flexible work place because its policy ostensibly allows workers to take unlimited unpaid breaks of any length. *See* Appellant's Brief at 6. Especially given the financial pressures many workers face, this is an extremely limited form of flexibility, one that is only meaningfully available to those who can afford to forego pay in order to use it.

---

[18] *See id.* at 77–78; *see also* Nick Wing, *Here's the Painful Truth About What It Means To Be 'Working Poor' In America*, Huffington Post (May 19, 2014), available at http://www.huffingtonpost.com/2014/05/19/working-poor-stories_n_5297694.html; Tami Lubhy, *Working, but still poor*, CNN.com (May 11, 2015), available at http://money.cnn.com/2015/05/07/news/economy/working-poor/.

The type of flexibility supported by the studies cited by Progressives' amicus go far beyond this limited approach. There is a growing movement, led by many employers and backed by social scientific research, to provide flexibility at work to assist workers seeking a work and life balance, and to generate employee productivity and less turnover. True flexibility offers significant benefits to both employers and employees and, along with fair pay, can help enable workers to meet their needs both at home and at work.

### C. Real-life workplace flexibility arrangements can have benefits for both employees and employers.

As chronicled in Progressive's amicus filed by the Support Center for Child Advocates, there are myriad well-developed and workplace-tested corporate policies that can help modern-day employees balance the competing demands of work and family. Though Support Center's amicus cannot link any of the work-life balance policies mentioned in its cited studies to anything Progressive has done, the flexible policies are useful, and could provide a road map for policies Progressive could adapt for its employees.

Scholarly research describes two types of flexibility generally that are particularly relevant for working parents: flexible work arrangements that allow employees more control over when and where they work on a daily basis; and formal and informal time-off policies that allow for paid short-term time off.[19]

---

[19] *See* Christensen et al., *supra* note 17, at 81.

Flexible work arrangements include employer-provided flextime, which permits variable start and end times for the workday; compressed workweeks; and various forms of reduced hours, including part-time, job sharing, and part-year work. Some flextime programs also allow employees to work longer hours, which they may later "draw out" for a variety of purposes, including providing care for their children during school breaks (predictable) or when they fall ill (unpredictable)."[20]

Flextime policies that permit flexible starting and quitting times within limits set by management are popular, and most employers find that flextime is a low-cost employee benefit that raises morale while enabling the organization to improve coverage, extend service hours, and reduce and even eliminate tardiness.[21]

Some employers go further and provide on-site childcare, unlimited sick days, early office closings, a family cafeteria where parents eat with their children, a gym, laundry service, elder care referral services, and a health clinic, for example. These benefits are "more than paid for by reductions in operational costs of turnover, recruitment, and absenteeism."[22]

As one study cited by amicus Support Center concludes:

> Working families spend a large portion of their productive lives contributing to the productive capacity of the organizations that employ them. For those families to contribute most productively,

---

[20] *Id.* at 79.
[21] *See* Schmidt & Duenas, *supra* note 16.
[22] *Id*. at 293.

they require task environments that accommodate the pressure
from balancing home and work responsibilities. While
government can provide incentives and work collaboratively with
employers towards accomplishing this balance, the primary
responsibility for creating the right environment rests directly on
organizations.[23]

As worker advocacy organizations, we strongly support efforts to provide

these supportive environments. When properly designed and combined with other

needed measures—like full and fair pay—these policies can benefit workers and

employers alike.

## CONCLUSION

Nothing in the lower court's ruling requiring payment for short breaks requires

Progressive to also refuse to allow breaks of any kind. As noted above, flexible

employment practices are beneficial for the employer. During times of heavy

workload, employees who feel that they have more flexible time arrangements are

able to work for longer before they start to feel that their work-life balance is

strained.[24] A National Study of the Changing Workplace reveals that employees

with flextime were "more satisfied with their jobs, more likely to want to remain

on the job, and showed more initiative than workers with no access to these

policies."[25]

---

[23] *Id.* at 303.
[24] *See* E. Jeffrey Hill, *Finding an Extra Day a Week: The Positive Influence of Perceived Job Flexibility on Work and Family Life Balance*, 50 Family Relations 49, 54 (2001).
[25] James T. Bond & Ellen Galinsky, Families & Work Inst., *Workplace Flexibility and Low-Wage Employees, Families And Work Institute: National Study Of The Changing Workplace*

13

If Progressive is serious about promoting flexibility for its employees as it claims, it should start by paying them at least the federal minimum wage and promote the kinds of practices chronicled in the Support Center's amicus brief.

For the forgoing reasons, this Court should uphold the district court's decision.

Dated: December 5, 2016                    Respectfully submitted,
                                                        s/ Margaret (Molly) Weston Williamson


                                   For *Amicus Curiae*



                            Margaret (Molly) Weston Williamson
                            A Better Balance
                            80 Maiden Lane, Suite 606
                            New York, NY 10038
                            (212) 430-5982
                            mwilliamson@abetterbalance.org

                            Catherine Ruckelshaus
                            National Employment Law Project
                            75 Maiden Lane, Suite 601
                            New York, NY 10038
                            (646) 693-8221
                            cruckelshaus@nelp.or
                            g

---

(2011); *see also* Kathleen Koster, *Nixing 9 to 5: Flexible work strategies for employers with a nonexempt workforce*, Employee Benefit News (October 1, 2011), available at https://www.highbeam.com/doc/1G1-268592548.html.

## CERTIFICATION OF BAR MEMBERSHIP

I, Margaret (Molly) Weston Williamson, certify pursuant to Local Rule 46.1 that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit Court of Appeal.


Dated: December 5, 2016

## CERTIFICATE OF COMPLIANCE

I hereby certify as follows:

(1) the Brief for Amicus Curiae complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because the brief has been prepared in proportionally spaced typeface using Microsoft Word 14 point Times New Roman font;

(2) the Brief for Amicus Curiae complies with the type volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,829 words, excluding those parts of the brief excluded by Fed. R. App. P.32(a)(7)(B)(iii), as calculated using the word count function on Microsoft Word software;

(3) the text of the electronic and hard copies of the Brief for Amicus Curiae is identical; and

(4) the electronic copy of the Brief for Amicus Curiae was scanned for electronic viruses on December 4, 2016 before transmission to this Court using Norton Antivirus, and no viruses were detected.

Dated: December 5, 2016

16

## CERTIFICATE OF SERVICE

I, Margaret (Molly) Weston Williamson, certify that on December 5, 2016, I caused a copy of this Brief for Amicus Curiae to be filed with the Clerk of Court using the *CM/ECF* system, and sent a hard copy of same to be served via regular mail upon the following counsel of record:


I also certify that on this same date, I caused 10 hard copies of the instant brief to be sent, via regular mail, to the Clerk of the Third Circuit Court of Appeals, in accordance with the Rules.

Dated: December 5, 2016